T.C. Memo. 1999-2

UNITED STATES TAX COURT

DENNIS W. STARK, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 8848-96.                    Filed January 4, 1999.

Joseph Falcone and Brian H. Rolfe, for petitioner.

Robert D. Heitmeyer, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, Judge:  Respondent determined the following deficiency in, and penalty on, petitioner's Federal income tax:

| Year | Deficiency | Accuracy-Related Penalty Sec. 6662(a) |
|---|---|---|
| 1992 | $132,341 | $26,468 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and

all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions, the issues for decision are: (1) Whether Lakeview Automotive, Inc., an S corporation wholly owned by petitioner, is entitled to a deduction for a bad debt loss under section 166 or, in the alternative, a theft loss under section 165; (2) whether Lakeview Automotive, Inc., is entitled to a deduction for a claimed rental expense; (3) whether Lakeview Automotive, Inc., is entitled to a deduction for legal fees incurred in defending a suit brought by a former shareholder; (4) whether Lakeview Automotive, Inc., is entitled to deductions for amounts expended for a fence gate, roof work, and computer equipment; and (5) whether petitioner is liable for an accuracy-related penalty under section 6662(b)(2).

FINDINGS OF FACT[1]

At the time the petition in this case was filed, Dennis W. Stark (petitioner) resided in Harrison Township, Michigan. Petitioner was the president and sole shareholder of Lakeview Automotive, Inc. (Lakeview), an automotive parts wholesaler. Lakeview was originally formed as a partnership by petitioner's father, William Stark (William), and William's brother-in-law. Lakeview's operations were conducted from real property at 6841

---

[1] Some of the facts have been stipulated and are so found. We incorporate by this reference the stipulation of facts, the supplemental stipulation of facts, and attached exhibits.

Middlebelt Road, Garden City, Michigan (Automotive Property).

In 1984, William bought his brother-in-law's one-half interest in Lakeview's predecessor partnership, thereby acquiring a 100-percent ownership interest. That same year, William incorporated Lakeview, and he and petitioner became 50-percent shareholders.[2] William retained direct ownership of the Automotive Property, however.

William also owned the lot adjacent to the Automotive Property, at 6435 Middlebelt Road (Fence Property), on which he operated the Stark Fence Company. The rear and side doors of the Automotive Property building were not accessible except through the Fence Property. On September 29, 1989, for the consideration of $1, William transferred the Fence Property to Lakeview Realty Company, a general partnership formed on the same date and in which William and petitioner each owned a 50-percent capital interest. There is no evidence that petitioner made any capital contribution to the Lakeview Realty Company partnership in exchange for his 50-percent capital interest. The Fence Property was appraised at $150,000 on October 30, 1989. Also on September 29, 1989, William conveyed his interest in the Automotive Property by a quitclaim deed to Lakeview for the consideration of $1.

Petitioner and William began to have disagreements that made

---

[2] Lakeview elected S corporation status on Dec. 23, 1988.

it impossible to operate Lakeview together. Their incompatibility resulted in an agreement executed on March 20, 1991, under which Lakeview agreed to redeem William's shares and petitioner agreed to purchase William's interest in the Fence Property (Redemption Agreement). On April 1, 1991, pursuant to the Redemption Agreement, Lakeview paid $490,000 to William in redemption of his shares, thereby terminating his interest in the corporation, and petitioner paid $75,000 to William in exchange for William's interest in the Fence Property.[3] The Redemption Agreement further provided for the repayment of a $39,079.75 debt Lakeview owed to William and contained a general release provision whereby the parties--namely, petitioner, William, and Lakeview--agreed to mutually forgive and release each other from any claims existing as of the April 1, 1991 closing date (except the aforementioned debt of Lakeview to William, payment of which was to be made at closing).

Subsequent to the execution of the Redemption Agreement, William became convinced he had been cheated. In William's view, petitioner and Lakeview's attorney had taken advantage of his diminished capacity, caused by a near fatal aortic aneurysm, the earlier death of his wife, and his emotional distress resulting from the disagreements with his son, to pressure him into the

---

[3] Although the Redemption Agreement provided that William would execute a quitclaim deed with respect to his interest in the Fence Property, William had in fact previously quitclaimed such interest to the Lakeview Realty Company partnership. Accordingly, on the Apr. 1, 1991 closing date of the Redemption Agreement, William effected the transfer to petitioner by assigning his partnership interest in Lakeview Realty Company to petitioner, and petitioner on the same day executed a certificate of discontinuance of the Lakeview Realty Company partnership.

buyout against his best interests and at an unconscionable price.

On November 1, 1991, William filed an action in State court naming Lakeview, petitioner, and Lakeview's attorney as defendants, and seeking rescission of the Redemption Agreement, return of the Fence Property, an accounting and appointment of a receiver to operate Lakeview, and damages from Lakeview, petitioner, and the corporate attorney, including punitive damages from the latter two.  The complaint alleged undue influence on the part of petitioner and the corporate attorney, failure of consideration, breach of fiduciary duty by the corporate attorney and by petitioner in his role as an officer of Lakeview, and intentional infliction of emotional distress by petitioner.  William's complaint was submitted for mediation, and on August 10, 1992, a mediation panel unanimously proposed an award of $100,000 in favor of William for which petitioner and Lakeview would have joint and several liability, and an award of $30,000 for which the corporate attorney would be liable. William rejected the mediation proposal, and the case proceeded to trial.  A jury found in favor of the defendants on all counts except rescission, which was decided in favor of the defendants by the court on November 2, 1992.  Lakeview paid $93,491 in legal fees during 1992 in connection with the foregoing litigation and claimed a deduction therefor on its return for that year.

Sometime in late 1992 petitioner engaged a certified public accountant to prepare amended returns for Lakeview for the years 1984 through 1990 in order to report income that petitioner

believed had previously been unreported by Lakeview.  It was petitioner's belief that Lakeview had failed to report income from cash sales in those years, due to William's practice of removing all or most cash from the register and splitting it with petitioner.  The accountant computed a ratio of cash to other sales for the then-most recent 18-month period, and on the basis of that ratio computed an estimate of the cash sales that may have occurred, but were not reported, for the years 1984 through 1990.  On the basis of these estimates, the accountant prepared amended returns for Lakeview that reported additional income in each of the foregoing years.  There are no work papers, corporate records, or other documentation in the record that support the accountant's estimates.

In December 1992, Amended U.S. Corporation Income Tax Returns (Forms 1120X) for Lakeview's 1984, 1985, 1986, 1987, and 1988 taxable years, and amended U.S. Income Tax Returns for an S Corporation (Forms 1120S) for Lakeview's 1989 and 1990 taxable years, were prepared and signed by the accountant as return preparer.  The returns were subsequently filed on an unknown date.  The returns reported previously unreported income of Lakeview totaling $189,098.  Petitioner filed Amended U.S. Individual Income Tax Returns (Forms 1040X) for his 1989 and 1990 taxable years reporting his allocable share of the previously unreported income reported on Lakeview's amended returns for those years.

Sometime in December 1992, petitioner caused to be prepared

an "Agreement to Release and Hold Harmless" (Release Agreement) that was to be executed by petitioner, William, and Lakeview. The Release Agreement was subsequently presented to William in late 1992 or in 1993. The Release Agreement certified that the parties had reviewed the Lakeview amended returns discussed above and contained a representation by the parties that they would file their individual State and Federal income tax returns (including any amended returns) in a manner consistent with Lakeview's amended returns. The Release Agreement further contained an acknowledgment by William of an indebtedness of $131,895 to Lakeview, Lakeview's forgiveness of the debt in 1992, and William's acknowledgment of receipt of an IRS Form 1099 reporting nonemployee compensation in that amount from Lakeview for 1992. Finally, the Release Agreement certified that the parties had reviewed another IRS Form 1099 reporting income of $75,000 paid to William by Lakeview in 1992, which was described as "for consulting services rendered and in consideration for this Agreement". The Release Agreement was not executed.

Notwithstanding the failure to execute the Release Agreement, Lakeview issued a Form 1099 for 1992 reporting income of $131,895 paid to William Stark, on which the payment was characterized as "Nonemployee compensation". On its 1992 return, Lakeview deducted $134,116[4] as "forgiveness of debt". At no

---

[4] The record is silent regarding the difference between the $131,895 figure used both as the debt for which William Stark's acknowledgment was sought in the Release Agreement and as the
(continued...)

point did Lakeview institute legal proceedings or otherwise seek to collect on an indebtedness from William.  Petitioner consulted with an attorney and accountant in connection with the decision not to seek collection.

Also notwithstanding the failure to execute the Release Agreement, Lakeview issued a $75,000 check that was dated December 30, 1992, and made payable to William.  William deposited the check on April 1, 1993.  The following handwritten legend appears on the back of the check above William's endorsement:

> RECEIVED AS PAYMENT OWED FOR ½ INTEREST OF LAND & BUILDING AT 6835 MIDDLEBELT RD GARDEN CITY[.]

A Form 1099 reporting income of $75,000 paid to William was issued by Lakeview for 1992, on which the payment was characterized as "Nonemployee compensation".  On its 1992 return, Lakeview claimed a $75,000 deduction for "rent".

In 1990, when petitioner and William were 50-percent shareholders of Lakeview, Lakeview had purchased automobiles for use by William and petitioner.  Lakeview paid $31,878.25 to purchase an automobile for William's use.  In connection with that purchase, the car dealer issued a check for $9,000 to Lakeview as payment for a traded-in vehicle, and William deposited the check into his personal account.

---

(...continued)
amount of "Nonemployee compensation" reported as paid to William Stark by Lakeview, and the $134,116 figure deducted as the "forgiven" debt on Lakeview's 1992 return.

During the tax year 1992, a fence gate at the entrance to Lakeview's premises was hit by a gravel truck and was damaged beyond repair. Lakeview arranged for the installation of a new gate, which was mounted on wheels and opened parallel to the fence, as opposed to swinging on a hinge as the old gate had operated. In addition, poles were added to the fence to support the new sliding gate. On its 1992 return, Lakeview deducted the $2,000 that it paid for the fence gate work as a repair expense.

Also during 1992 Lakeview paid a roofing contractor for work done on the roof of the Automotive Property to correct leaks. Previous attempts at repairing the roof were unsuccessful, due to the fact that the roof had originally been designed to collect water for cooling purposes. Consequently, the roofing material was removed down to the wooden structure of the building, to which a new roof drain was added, and a new roof was reapplied. The replacement roof is expected to last 20 years. On its 1992 return, Lakeview deducted the $3,400 that it paid for the roof work as a repair expense.

## OPINION

### 1. "Forgiveness of Debt" Deduction

Respondent disallowed a $134,116 "forgiveness of debt" deduction claimed by Lakeview on its 1992 return. Petitioner contends that from 1984 through 1990, William skimmed cash from Lakeview and split it with petitioner. When petitioner subsequently became the sole shareholder of Lakeview, he filed amended corporate returns for Lakeview reporting additional

income for those years totaling $189,098, based upon his accountant's estimate of Lakeview's cash sales during the period. Petitioner contends that although he repaid to Lakeview his share of the diverted cash, William did not, and thus remained obligated to the corporation for the diverted amounts. The $134,116 "forgiveness of debt" deduction claimed by Lakeview in 1992 represents the sum of what petitioner contends is William's share of the skimmed cash, plus the price of an automobile purchased for William with corporate funds, along with the $9,000 check issued to Lakeview for a traded-in car that William converted to personal use.[5]

a. Theft Loss

Notwithstanding Lakeview's return position that it was entitled to a $134,116 deduction for the "forgiveness of debt", petitioner on brief first argues that Lakeview is entitled to deduct this amount as a theft loss under section 165. Petitioner contends that William's actions amounted to embezzlement under Michigan law, and Lakeview is therefore entitled to a deduction because section 1.165-8(d), Income Tax Regs., identifies a "theft" as including embezzlement. However, even if we accept petitioner's contentions regarding the cash diversions, it is well established that a diversion of corporate funds by

---

[5] We note that the sum of (i) one-half of the additional income of $189,098 reported on Lakeview's amended returns for 1984 through 1990 (i.e., $94,549), plus (ii) the $31,878 purchase price for the automobile provided William, plus (iii) the $9,000 converted check, equals $135,427, not $134,116. Petitioner offers no explanation for this discrepancy.

shareholders with complete, or near complete, control of the corporation does not entitle the corporation to a theft loss deduction, regardless of how embezzlement is defined under local law. Federbush v. Commissioner, 34 T.C. 740, 752 (1960), affd. 325 F.2d 1 (2d Cir. 1963); United Mercantile Agencies, Inc. v. Commissioner, 23 T.C. 1105, 1114 (1955), remanded on other grounds sub nom. Drybrough v. Commissioner, 238 F.2d 735 (6th Cir. 1956); Ace Tool & Engg., Inc. v. Commissioner, 22 T.C. 833, 842 (1954). In such a situation, the shareholders have the implied consent of the corporation and take the funds under a claim of right. Federbush v. Commissioner, supra at 750; United Mercantile Agencies, Inc. v. Commissioner, supra.

Petitioner and William together owned 100 percent of the stock of Lakeview at the time when petitioner contends that cash was skimmed, and petitioner concedes that he received half of the diverted funds. The same is true regarding the automobiles provided to them. The diversion of Lakeview's assets was not a theft for purposes of allowing the corporation a deduction. Federbush v. Commissioner, supra; United Mercantile Agencies, Inc. v. Commissioner, supra. This conclusion is buttressed by the terms of the Redemption Agreement, which was executed in 1991, after the purported thefts. In that agreement, notwithstanding petitioner's full knowledge of the cash skimming, neither Lakeview nor petitioner sought to press any claim or offset against William for the purported embezzlement. On the contrary, the document acknowledged a debt of $39,079.75 owed by

Lakeview to William.

b. Bad Debt Deduction

Petitioner alternatively contends that William's diversions of corporate funds gave rise to a debt by operation of law that was owed to Lakeview, and that this debt became worthless in 1992, thereby entitling it to a bad debt deduction under section 166(a)(1).

Section 166(a)(1) allows a deduction for "any debt which becomes worthless within the taxable year."  Under section 1.166-1(c), Income Tax Regs., the debt must be "bona fide", defined as "a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money."

The existence of a debt for purposes of section 166 ordinarily requires a showing that contemporaneously with a transfer of money the transferor and recipient both intend to establish an enforceable obligation of repayment.  Delta Plastics Corp. v. Commissioner, 54 T.C. 1287, 1291 (1970); Fisher v. Commissioner, 54 T.C. 905, 909-910 (1970).  Here, however, petitioner argues that a debt arose not from the parties' intent, but by operation of law, relying on Iowa S. Utils. Co. v. United States, 348 F.2d 492 (Ct. Cl. 1965).  In that case, the Court of Claims held that an intent to create a debtor-creditor relationship is unnecessary to create a bona fide debt where the debt arises by operation of law.

Petitioner's argument fails for several reasons.  First,

petitioner has failed to demonstrate the amount of the debt.  A debt for purposes of section 166 must be an enforceable obligation to pay a "fixed or determinable sum of money".  Sec. 1.166-1(c), Income Tax Regs.  In Iowa S. Utils. Co., the debt had been adjudicated, and the State court judgment served to make the debt "a fixed or determinable sum" in the Court of Claims' view. Iowa S. Utils. Co. v. United States, supra at 495.  Here, the only evidence of the amounts William diverted, which he disputes, is the testimony of petitioner and his accountant that the ratio of cash to total sales for the then-current 18-month period was computed, and then an estimate of the cash sales for the years 1984 through 1990 was made by applying the current-period ratio to actual sales in those past years.  There is no evidence in the record of the reasonableness of this estimate, the appropriateness of applying the current ratio to past years, or of any corporate records to support the accuracy of this estimate.  On this record, petitioner has failed to show that the debt he alleges was of a "fixed or determinable" amount.

Second, petitioner has not shown that the debt became worthless in 1992.  Section 166 allows a deduction for debts which become worthless "within the taxable year."  To meet this requirement, the taxpayer must prove that the debt had value at the commencement of the year for which deduction is sought and that it became worthless during that year.  Estate of Mann v. United States, 731 F.2d 267, 275 (5th Cir. 1984); James A. Messer Co. v. Commissioner, 57 T.C. 848, 861 (1972); Shipley v.

Commissioner, 17 T.C. 740 (1951). We do not believe petitioner has shown that the purported debt had value at the beginning of 1992. The undisputed terms of the Redemption Agreement provide for the forgiveness and release of all claims that Lakeview, William, or petitioner may have had against each other as of the execution date, which was March 20, 1991 (except for a debt owed by Lakeview to William, acknowledged in the Agreement). The actions of William that petitioner contends gave rise to the purported debt, i.e., the skimming of cash (of which petitioner was aware) and the conversion of the car and trade-in payment to personal use, all occurred prior to the execution of the Redemption Agreement. Thus, any debt arising from William's skimming and conversion was forgiven by Lakeview on March 20, 1991. The debt had no value at the beginning of 1992.

Even if William's purported debt to Lakeview somehow survived the release in the Redemption Agreement, petitioner has failed to show that it became worthless in 1992. Petitioner contends that he had sufficient evidence of the worthlessness of the debt in 1992 based on the advice of his attorney that the cost of collecting the debt would have exceeded its value. In making this argument, petitioner concedes that William had sufficient assets from which to collect the debt that petitioner claims was owed to the corporation.[6]

---

[6] The record is clear that William had sufficient assets from which to pay the alleged debt in 1992. In the previous year, William had received $42,579.75 from Lakeview in addition

(continued...)

Where the surrounding circumstances indicate a debt is worthless and uncollectible, and the legal action to enforce payment in all probability would not result in satisfaction on execution of a judgment, a showing of these facts will be sufficient evidence of the worthlessness of the debt. Sec. 1.166-2(b), Income Tax Regs. We have allowed a bad debt deduction where the taxpayer received advice of legal counsel, based on objective facts, that the cost of recovery would exceed the amount of the debt. See Johnstone v. Commissioner, 17 B.T.A. 366, 368 (1929); United States Tool Co. v. Commissioner, 3 B.T.A. 492 (1926); Green v. Commissioner, T.C. Memo. 1976-127. Nevertheless, a debt is not worthless merely because it may be difficult to collect. Reading & Bates Corp. v. United States, 40 Fed. Cl. 737, 757 (1998). To be entitled to a deduction under section 166(a)(1), a taxpayer must exhaust all reasonable means of collection or prove that such steps would be futile. H.D. Lee Mercantile Co. v. Commissioner, 79 F.2d 391, 393 (10th Cir. 1935); Perry v. Commissioner, 22 T.C. 968, 974 (1954); A. Finkenberg's Sons, Inc. v. Commissioner, 17 T.C. 973, 984 (1951). Choosing not to enforce a debt does not render it worthless. Southwestern Life Ins. Co. v. United States, 560 F.2d 627, 644 (5th Cir. 1977).

---

[6](...continued)
to the $490,000 received for his Lakeview stock and the $75,000 received for his half interest in the Fence Property. During 1992, William received another check for $75,000 from Lakeview. In addition, William owned several parcels of real estate.

We do not believe that the record, including the testimony of petitioner's attorney, supports petitioner's contention that the cost of collecting on the alleged debt would have exceeded its value. Petitioner's attorney in the litigation over the Redemption Agreement, William Horton, testified that based on his experience in litigating against William, he believed that William would be a tenacious and difficult adversary in any further litigation. In light of this experience, Mr. Horton believed that pursuing the debt "wasn't worth it" and so advised petitioner and his accountant.

This testimony does not establish that the costs of collection would exceed the value of a debt claimed to equal $134,116. Indeed, petitioner presented no evidence that he or Lakeview ever even made a demand for payment to William. In light of the fact that William had sufficient assets with which to pay the alleged debt, we do not believe that petitioner has proven that attempts to collect on the debt would have been futile. We thus conclude that petitioner has failed to prove that, assuming a bona fide debt existed, it was worthless.

2. Rent Deduction

Lakeview deducted $75,000 as rent on its 1992 return, which was disallowed by respondent. Petitioner claims that Lakeview paid $75,000 to William in late 1992 as "back rent" on the Fence Property. Petitioner testified that sometime after the conclusion of the trial in the action brought by William, William demanded that he be paid rent by Lakeview for Lakeview's use of

the Fence Property during the period that he owned it outright (which was from sometime in 1984 until September 29, 1989). According to petitioner, the $75,000 figure was based on his computation of annual rent equal to 10 percent of the Property's appraised value of $150,000 for 5 years ($15,000 (10 percent of $150,000) X 5 years = $75,000).

Petitioner offered no evidence to corroborate his testimony, and a substantial amount of other evidence undermines it.

First, contrary to petitioner's testimony at trial, Lakeview earlier characterized the $75,000 differently on the Form 1099 it prepared with respect to the payment. On the Form, the box for "Nonemployee compensation" was checked rather than the box for "Rent". Previously, in the Release Agreement prepared at petitioner's direction, the $75,000 payment was characterized as "for consulting services rendered and in consideration for this Agreement". Lakeview's accountant testified that it was his understanding that the $75,000 payment was intended as consideration for William's execution of the Release Agreement. William denied providing any consulting services to Lakeview during 1992, and in light of the fact that he was involved in acrimonious litigation with the company and petitioner during that time, we find his denial credible.

Second, petitioner's testimony is further contradicted by William's testimony that he never demanded rent, but instead sought to be paid the remaining one-half of the purchase price he considered owed to him for the Fence Property. (William had

previously received a payment of $75,000 for his one-half interest in the Fence Property as part of the Redemption Agreement in 1991, and although he had previously gifted the other one-half interest in the Fence Property to petitioner in 1989, he claimed at trial that he did not understand or intend the gift.) On the $75,000 check issued to him by Lakeview on December 30, 1992, William wrote above his endorsement that the amount was received as payment owed for one-half interest in the Fence Property.

Third, the surrounding circumstances do not support petitioner's contention at trial. During the same period for which petitioner claims William sought back rent for the Fence Property, William also owned outright the Automotive Property which was also being used by Lakeview. We find it implausible that William would have demanded back rent from Lakeview for one parcel but not the other.

Finally, petitioner has offered no evidence that $15,000, or 10 percent of appraised value, per year represented the fair rental value of the Fence Property, or that 5 years is the appropriate rental period. In the circumstances, we find it more likely that the $75,000 payment was premised on one-half of the appraised value of the Fence Property; petitioner's formula has the appearance of an after-the-fact rationale.

Section 162(a)(3) allows a deduction for all ordinary and necessary expenses of carrying on a trade or business, including rentals. However, deductions are a matter of legislative grace,

and a taxpayer claiming a deduction bears the burden of clearly showing that the terms of the applicable statute have been satisfied.  INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435 (1934). On this record, we do not believe petitioner has demonstrated that Lakeview paid $75,000 for rent in 1992, and we accordingly sustain respondent's determination to disallow this amount.

3. Legal Expenses

    a. Background--Origin of the Claim Test

    Respondent argues that Lakeview is not entitled to deduct $93,491 in claimed legal expenses incurred in connection with the lawsuit brought by William because the lawsuit constituted a personal dispute between William and petitioner.  Thus, respondent contends, under the "origin of the claim" test of United States v. Gilmore, 372 U.S. 39 (1963), the legal expenses were personal to petitioner and may not be deducted by Lakeview. Alternatively, respondent argues that to the extent any of the expenses are found not to be personal to petitioner but attributable to Lakeview, they must be capitalized because "they are not proximately related to the trade or business conducted by Lakeview * * * but rather related to the control of the corporation."

    Petitioner likewise employs the "origin of the claim" test, and argues against capitalization of the legal expenses on the grounds that they were expended to defend against an attack on the business, that was "in essence a hostile takeover attempt",

and accordingly are deductible as ordinary and necessary business expenses under the reasoning of A.E. Staley Manufacturing Co. v. Commissioner, 119 F.3d 482, 491 (7th Cir. 1997), revg. 105 T.C. 166 (1995), and Federated Dept. Stores, Inc. v. Commissioner, 171 Bankr. 603 (S.D. Ohio 1994). Petitioner further contends that to the extent any personal benefit was conferred on him, the legal expenses are nonetheless deductible by Lakeview because the corporation was a principal defendant in the lawsuit and its assets were directly threatened, citing Kopp's Co. v. Commissioner, 636 F.2d 59 (4th Cir. 1980).

We disagree with both of the analyses offered by the parties, but hold for respondent for different reasons.

The Supreme Court has held that the determination of whether a litigation expense is a deductible business expense or a nondeductible personal one depends upon "the origin and character of the claim" being litigated. United States v. Gilmore, supra at 49. In that case, the taxpayer sought to deduct the legal expenses he incurred in a divorce proceeding, on the grounds that he was seeking to conserve income-producing property; namely, his controlling stock interests in certain automobile dealerships, against his wife's claim to all or part of them under community property laws. Applying the "origin of the claim" test, the Court concluded that the claim arose entirely from the marital relationship, not from any income-producing activity, and consequently the expenses were nondeductible personal ones. Id.

at 51-52.

The "origin of the claim" test is likewise used to determine whether litigation expenses are to be classified as ordinary or capital.  Woodward v. Commissioner, 397 U.S. 572 (1970); United States v. Hilton Hotels Corp., 397 U.S. 580 (1970).

Application of the "origin of the claim" test requires an examination of all the facts and circumstances and focuses on the "kind of transaction" from which the litigation stems.  Boagni v. Commissioner, 59 T.C. 708, 713 (1973).

b. Personal versus Business Expense

The lawsuit in which the legal expenses were incurred was brought by William against petitioner, Lakeview, and Lakeview's attorney[7] because William believed he had been cheated in the Redemption Agreement and wanted to get back his Lakeview stock and the management role that such ownership entailed, as well as his interest in the Fence Property.  William believed that petitioner and the corporate attorney had taken advantage of his diminished capacity, caused by a serious heart ailment and emotional distress, to pressure him into the buyout against his best interests and at an unconscionable price.  William further alleged that he had been improperly pressured into entering the Redemption Agreement due to petitioner's tantrums designed to frustrate business decision-making or to embarrass him in front

---

[7] The legal expenses incurred by Lakeview's corporate attorney in defending against William's lawsuit were not paid by Lakeview and are not at issue in this case.

of Lakeview's employees, petitioner's periods of silence, and petitioner's willful absence from the business premises.  As relief, William sought rescission of the Redemption Agreement and return of his Lakeview stock and interest in the Fence Property, appointment of a receiver and an accounting, consequential damages stemming from his loss of income from Lakeview and his income tax liabilities incident to the disposition of his stock and real property, and damages for intentional infliction of emotional distress.

Based on our review of the pleadings in the lawsuit and other evidence in the record, we believe that William's principal claims in the litigation were for the return of his Lakeview stock and the Fence Property.  The other damages sought by him were largely derivative, designed either to preserve the status quo ante (such as the accounting and appointment of a receiver), or to compensate him for consequential losses resulting from the stock redemption and sale of the Fence Property, or to punish the defendants for wrongful acts that led to or were connected with his decision to enter the Redemption Agreement (e.g., punitive damages or damages for intentional infliction of emotional distress).

Respondent argues that under United States v. Gilmore, supra, the legal fees are nondeductible personal expenditures because "The origin of the lawsuit, and of its defense by the petitioner, was the breakdown of a father-son relationship" and that "these fees were incurred primarily for the individual

benefit of the petitioner on account of a highly personal, emotionally charged familial dispute."

We believe respondent misapplies <u>Gilmore</u>.  Petitioner and William had been business partners.  Their dispute, and William's claims, arose from the terms and circumstances of William's buyout and, to a certain extent, petitioner's treatment of him in the workplace.  We believe that all of the claims concerned actions by petitioner in his capacity as a shareholder, officer, or employee of Lakeview, or in the workplace.  In our view, these claims had their origin in "income-producing activities" as that term was used in <u>Gilmore</u> to distinguish the origins of deductible business expenses from those of nondeductible personal ones. That the litigants were father and son, and their dispute heavily infused with familial emotions, does not make the attendant legal expenses "personal" within the meaning of <u>Gilmore</u>.  Had Mr. Gilmore's wife also been his business partner, and sought a portion of the automobile dealership stock on that basis, the Court may well have reached a different result.  Cf. <u>Kornhauser v. United States</u>, 276 U.S. 145 (1928) (legal expenses of taxpayer in defending against claim of former business partner that fees paid to taxpayer were for services rendered during partnership, held deductible).

Moreover, we believe that the return of his Lakeview stock was the most significant relief sought by William, given its value in relation to the other relief sought.  That stock had been redeemed by Lakeview, not purchased by petitioner.

Accordingly, we have difficulty seeing how the expenses of defending against William's effort to reclaim the Lakeview stock were personal to petitioner rather than an expense of Lakeview.

Such is not the case with the Fence Property, however. Although neither party has addressed the issue, we do not believe that Lakeview is entitled to deduct any portion of the legal fees allocable to the defense of William's effort to reclaim his interest in the Fence Property. Pursuant to the Redemption Agreement, petitioner personally purchased William's interest in the Fence Property; it was thus not a corporate asset and Lakeview's expenditures in defense of petitioner's title to it were, strictly speaking, a constructive dividend.[8] Petitioner has not provided, and we are unable to discern, any basis for allocating a portion of the legal fees to the Fence Property defense. In any event, the failure to allocate is of little consequence because, as discussed more fully infra, the origin of the claim related to these legal expenses was the process of acquisition of a capital asset, in this instance an interest in the Fence Property.

c. Capital versus Ordinary

To the extent that the fees are not personal to petitioner

---

[8] Because we conclude, with respect to the claim that the legal expenses were personal, that such expenses either were not personal or were personal because expended in defense of an asset held not by Lakeview but in petitioner's name, we find it unnecessary to address petitioner's argument based on Kopp's Co. v. Commissioner, 636 F.2d 59 (4th Cir. 1980), that the legal expenses were not personal because Lakeview's assets were directly threatened by the litigation.

but an expense of Lakeview, we must decide whether such expense is required to be capitalized. Madden v. Commissioner, 514 F.2d 1149 (9th Cir. 1975); BHA Enters., Inc. v. Commissioner, 74 T.C. 593, 599 (1980). If an expense is capital in nature, a taxpayer may not deduct it as an ordinary and necessary business expense under section 162. Sec. 263(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); Woodward v. Commissioner, 397 U.S. 572, 575 (1970); United States v. Hilton Hotels Corp., 397 U.S. 580 (1970). A taxpayer must capitalize costs associated with the creation of a separate and distinct asset or where the taxpayer receives more than incidental future benefits as a result of the expenditure. INDOPCO, Inc. v. Commissioner, supra at 86-87. In INDOPCO, Inc. v. Commissioner, supra at 84, the Supreme Court noted that "deductions are exceptions to the norm of capitalization".

"[S]tock is most naturally viewed as a capital asset," Arkansas Best Corp. v. Commissioner, 485 U.S. 212, 222-223 (1988), and legal expenses incurred in the acquisition of a capital asset must be capitalized. Woodward v. Commissioner, supra at 576; Third Natl. Bank v. United States, 427 F.2d 343 (6th Cir. 1970). Expenses are incurred in the acquisition of an asset if "the origin of the claim litigated is in the process of acquisition itself." Woodward v. Commissioner, supra at 577.

This Court has held that where the circumstances surrounding the sale of stock (not sold as inventory) are the subject of litigation that arose subsequent to the transaction, the legal fees incurred are capital expenditures. Wagner v. Commissioner,

78 T.C. 910, 918 (1982); Locke v. Commissioner, 65 T.C. 1004, 1011-1013 (1976), affd. 568 F.2d 663 (9th Cir. 1978). In Locke v. Commissioner, supra at 1011-1013, this Court found that legal costs incurred in defending a fraud suit brought by the seller of stock, subsequent to the consummation of the sale, were capital expenditures. See also Wagner v. Commissioner, supra (same result where purchaser brought the suit). In Locke we held that the origin of the claim was the fraud and concealment that allegedly took place during the sale of the stock, and therefore the legal fees incurred were capital in nature since they related to the acquisition of the stock, a capital asset.

In the instant case, the essence of the lawsuit brought by William against Lakeview and petitioner was an effort to rescind the contract under which Lakeview redeemed William's stock. Consummation of that contract, the Redemption Agreement, was a transaction involving the acquisition and disposition of a capital asset, stock. Sec. 1221; Frederick Weisman Co. v. Commissioner, 97 T.C. 563, 572 (1991); Proskauer v. Commissioner, T.C. Memo. 1983-395. Because Lakeview incurred the legal fees in defending claims that arose from a transaction involving the acquisition of a capital asset, under the "origin-of-the-claim" test the cost of such fees must be capitalized.[9]

---

[9] As noted previously, some portion of the legal fees may be attributable to defending petitioner against William's effort to reclaim his interest in the Fence Property. Any portion so attributable would be required to be capitalized because it arose from a transaction involving the acquisition of interests in real

(continued...)

Petitioner, again relying on A.E. Staley Manufacturing Co. v. Commissioner, 119 F.3d 482 (7th Cir. 1997), revg. 105 T.C. 166 (1995), and Federated Dept. Stores, Inc. v. Commissioner, 171 Bankr. 603 (S.D. Ohio 1994), affg. In re Federated Dept. Stores, Inc., 135 Bankr. 950 (S.D. Ohio 1992), argues that the legal fees were incurred to avoid a hostile takeover attempt by William and are thus deductible under section 162(a) as ordinary and necessary business expenses under the reasoning of those cases. In A.E. Staley Manufacturing Co. v. Commissioner, supra, the Court of Appeals for the Seventh Circuit reversed our decision, in which we held that certain investment banking fees had to be capitalized because incurred in connection with a change in corporate ownership that produced benefits for the corporate taxpayer extending beyond the taxable year. In reaching that result, we reasoned that it did not matter whether the change in ownership occurred as a result of a "hostile" or "friendly" takeover. Id. at 198. The Court of Appeals disagreed, reasoning

⁹(...continued)
estate, also a capital asset.

We also have no basis in the record on which to determine the amount of legal fees allocable to William's other peripheral claims, such as intentional infliction of emotional distress. Faced with the absence of any evidentiary basis on which to attribute fees to any particular claim, we are unable to allocate the legal fees between deductible and capital expenses and hold that they are, in the aggregate, capital. See Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930), affg. in part and remanding in part 11 B.T.A. 743 (1928); Vanicek v. Commissioner, 85 T.C. 731, 743 (1985); Churchill Farms, Inc. v. Commissioner, T.C. Memo. 1969-192, affd. sub nom. Bayou Verret Land Co. v. Commissioner, 450 F.2d 850 (5th Cir. 1971).

that because the takeover had been hostile, and the bulk of the fees[10] was expended in an effort to thwart it, they produced no benefit extending beyond the taxable year. According to the Court of Appeals, the fees were thus more properly viewed as costs associated with defending a business or existing corporate policies against attack, which were deductible under section 162(a), rather than as costs associated with facilitating a capital transaction, required to be capitalized.[11]

Petitioner contends that we should follow the Court of Appeals for the Seventh Circuit's decision and find the legal expenses at issue herein deductible because they were incurred in "a defense to an attack on the business" or "to thwart what amounted to a hostile takeover attempt". However, the instant case provides no occasion for us to consider whether to adopt the reasoning of the Court of Appeals decision, because it is readily distinguishable.

Petitioner's attempt to characterize William's effort to rescind the Redemption Agreement as a hostile takeover attempt or an attack on existing business practices is simply unavailing. The critical difference is that the dispute in this case was over the terms of a completed capital transaction. The origin of

---

[10] The Court of Appeals concluded that a small portion of the fees were facilitative of the ownership change and were therefore required to be capitalized.

[11] The Court of Appeals concluded in the alternative that a significant portion of the costs were deductible under sec. 165(a) as costs associated with abandoned capital transactions, because they were incurred to develop ultimately unsuccessful alternatives to the ownership change which occurred.

William's lawsuit was a capital transaction, namely, the redemption of his stock and the sale of certain real property to petitioner, which William sought to rescind.  This case thus falls squarely within the rule that legal expenses incurred in the acquisition of a capital asset must be capitalized if "the origin of the claim litigated is in the process of acquisition itself."  Woodward v. Commissioner, 397 U.S. 572, 577 (1970); see also Wagner v. Commissioner, supra; Locke v. Commissioner, supra.

In defending against William's lawsuit, Lakeview sought to preserve the terms of a completed capital transaction.  Lakeview was successful in that regard.  The legal fees incurred by Lakeview were thus expended to facilitate a capital transaction, not to thwart it, and they produced benefits extending beyond the taxable year, e.g., the removal of a shareholder deemed troublesome by the surviving shareholder, the elimination of conflicting views regarding management, etc.  Requiring that these legal fees be capitalized thus conforms to the guidelines established by the Supreme Court in INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).  Because this case does not involve fees expended to thwart a capital transaction or change in ownership, the result we reach is not inconsistent with the holding of the Seventh Circuit Court of Appeals in A.E. Staley Manufacturing Co. v. Commissioner, supra.  We accordingly sustain respondent's determination that the legal fees at issue are not deductible.

4. Expenditures on Gate and Roof

Respondent disallowed deductions claimed by Lakeview as repair expenses that included $3,400 for the replacement of a roof and $2,000 for the replacement of a fence gate. We agree with respondent that these expenses were capital in nature and not currently deductible.

Costs of repairs which keep property used in a trade or business in an ordinarily efficient operating condition may be deducted as an ordinary and necessary business expense under section 162. Sec. 1.162-4, Income Tax Regs. Repairs in the nature of replacements, and costs that appreciably prolong the useful life of property, or that materially add to its value, are not deductible but rather must be capitalized. Id. The determination of whether an expenditure is deductible or must be capitalized is a question of fact, and distinctions drawn "are those of degree and not of kind". INDOPCO, Inc. v. Commissioner, supra at 86. Although a repair adds value to unsound property, "The proper test is whether the expenditure materially enhances the value, use, life expectancy, strength, or capacity as compared with the status of the asset prior to the condition necessitating the expenditure." Plainfield-Union Water Co. v. Commissioner, 39 T.C. 333, 338 (1962).

Petitioner did not repair the gate; he replaced it. Ordinarily, a replacement constitutes a capital expenditure, but petitioner argues that because the gate is a part of the fence, replacement merely restored the fence to its prior condition and did not prolong its life. Respondent takes the position that the

costs of the gate must be capitalized because they constitute a "major repair or replacement."

Regardless of whether the gate is viewed as separate from or integral to the fence, we believe the substantial nature of the replacement renders it a capital expenditure. Furthermore, the new gate did improve the property as it freed up the area that formerly was necessary for the path of the old swing gate. Poles were added to the existing fence to support the new gate. Cf. Honigman v. Commissioner, 55 T.C. 1067, 1081 (1971), affd. in part, revd. in part and remanded on other grounds 466 F.2d 69 (6th Cir. 1972) (replacing concrete floor section was a capital expense where structural supports were added). Considering all the facts and circumstances, we hold that the expense of replacing the gate is capital in nature.

We next consider the $3,400 deduction claimed by Lakeview with respect to work done on its roof. The roof was removed "right down to the wood" and then replaced, along with the addition of a new roof drain.

Petitioner relies on Oberman Manufacturing Co. v. Commissioner, 47 T.C. 471, 482 (1967), where the removal of the material covering the roof, the insertion of an expansion joint, and the recovering of the roof with new material was held to be currently deductible since it merely kept the leased property in an operating condition over its probable useful life. In Oberman Manufacturing Co., steel plates that were the basic foundation of the roof were not replaced. By contrast, Lakeview's entire roof

was replaced, and a new roof drain was added to the structure of the building.  Lakeview's old roof was beyond repair because of a flaw in its design for drainage.  The replacement roof is expected to last 20 years.  As opposed to the roof at issue in Oberman Manufacturing Co., the replacement of petitioner's roof prolonged its useful life.  The cost of the new roof is a capital expense.  Ritter v. Commissioner, 163 F.2d 1019 (6th Cir. 1947); Georgia Car & Locomotive Co., 2 B.T.A. 986, 990 (1925); Ettig v. Commissioner, T.C. Memo. 1988-182; see also Badger Pipe Line Co. v. Commissioner, T.C. Memo. 1997-457; Drozda v. Commissioner, T.C. Memo. 1984-19.

5. Computer

Respondent asserted in his trial memorandum and on brief that petitioner is not entitled to a deduction taken with respect to computer equipment in the amount of $723.  (Although respondent uses the figure of $773 in his brief, based on the entire record the correct figure appears to be $723.)  Since petitioner has not addressed this issue, he is deemed to have conceded it.  See Rules 149(b), 142(a).

6. Accuracy-Related Penalty

In the Notice of Deficiency, respondent determined that petitioner is liable for an addition to tax for a substantial understatement of income tax under section 6662(b)(2).[12]

---

[12] On brief respondent argues that petitioner is also subject to a penalty for negligence or disregard of the rules or regulations under sec. 6662(b)(1), but there was no determination to this effect in the Notice of Deficiency or assertion in the answer.  Respondent has not moved to amend the pleadings.  In any
(continued...)

Respondent's determinations are presumed correct, and petitioner bears the burden of proving that the penalties do not apply. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972).

Section 6662(a) imposes a penalty in an amount equal to 20 percent of the portion of an underpayment of tax attributable to any substantial understatement of income tax. Sec. 6662(b)(2). An understatement of tax is substantial if it exceeds the greater of 10 percent of the tax required to be shown in the return or $5,000. Sec. 6662(d)(1)(A). No penalty under section 6662(a) is imposed, however, with respect to any portion of an underpayment if there was reasonable cause for such portion and the taxpayer acted in good faith with respect thereto. Sec. 6664(c)(1).

Petitioner contends that there was reasonable cause for the tax treatment of the items at issue because the deductions claimed by Lakeview were based on the advice of a certified public accountant (C.P.A.). The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all the relevant facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. A taxpayer may demonstrate reasonable cause if he can show that he relied in good faith on a qualified adviser after full disclosure of all necessary and relevant information. Jackson v.

---

12(...continued)
event, petitioner's claim of reasonable cause under sec. 6664(c)(1), discussed infra, would eliminate the negligence penalty under sec. 6662(b)(1) to the same extent as the penalty for substantial understatement under sec. 6662(b)(2).

<u>Commissioner</u>, 86 T.C. 492, 539-540 (1986), affd. 864 F.2d 1521 (10th Cir. 1989).

Petitioner has shown that Lakeview acted with reasonable cause in claiming the $134,116 "forgiveness of debt" deduction. There is ample evidence in the record that Lakeview's C.P.A. was provided with information concerning petitioner's position that William had diverted assets from Lakeview. Furthermore, Lakeview and its C.P.A. consulted legal counsel concerning whether recovery from William was feasible. Although Lakeview received incorrect advice regarding its "forgiveness of debt" deduction, we are satisfied that it took the deduction in good faith based on professional advice, after adequate disclosure to advisers. Therefore, there was reasonable cause and good faith with respect to the portion of the underpayment attributable to the "forgiveness of debt" deduction.

We do not believe that petitioner has shown that he relied in good faith on qualified advice, or otherwise had reasonable cause, with respect to the remaining deductions disallowed by respondent.[13] With respect to Lakeview's $75,000 deduction for "rent", petitioner has failed to establish that full disclosure was made to Lakeview's C.P.A. The C.P.A. testified that it was <u>his</u> understanding that this payment was intended as consideration for William's execution of the Release Agreement, although the

---

[13] Petitioner has not argued that any portion of the understatement should be reduced pursuant to sec. 6662(d)(2)(B) because there was substantial authority for, or adequate disclosure of, the tax treatment of any item.

C.P.A. signed Lakeview's 1992 Form 1120S that labels the $75,000 as rent.  A third characterization of the payment was made on a Form 1099 issued by Lakeview to William labeling it as "Nonemployee compensation".

With respect to the claimed deductions for the legal fees, gate, roof, and computer expenses, petitioner has failed to meet the burden of showing that Lakeview provided its accountant with complete and accurate information.  The only evidence pertaining to the issue is Lakeview's C.P.A.'s signature on the corporation's 1992 return, which we conclude is insufficient support for the inference that Lakeview supplied its C.P.A. with complete and accurate information.  Petitioner argues on brief that "at no time did respondent even attempt to claim that [Lakeview's accountant] * * * had not been given all the facts by petitioner."  However, the burden is on petitioner to affirmatively show that Lakeview's accountant received the requisite information.  Rule 142(a); see Selig v. Commissioner, T.C. Memo. 1995-519.

To reflect the foregoing,

Decision will be entered
under Rule 155.